UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 08-32646 (LMW) |
| | ) | | |
| DOUGLAS RICHARD BUDNICK | ) | CHAPTER | 7 |
| a/k/a DOUGLAS R. BUDNICK, | ) | | |
| | ) | | |
| DEBTOR. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| CONNECTICUT ATTORNEYS TITLE | ) | ADV. PRO. NO. | 08-3117 |
| INSURANCE COMPANY, | ) | | |
| | ) | | |
| PLAINTIFF | ) | ECF NO. | 1 |
| | ) | | |
| vs. | ) | | |
| | **)** | | |
| DOUGLAS RICHARD BUDNICK | ) | | |
| a/k/a DOUGLAS R. BUDNICK, | ) | | |
| | ) | | |
| DEFENDANT. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**APPEARANCES**

John B. Swanson, Esq.                    Attorney for Plaintiff Connecticut Attorneys
Nancy Gould, Esq.                         Title Insurance Company
Gould, Killian & Wynne
280 Trumbull Street, 21st Floor
Hartford, CT 06103-3514


Joel M. Grafstein, Esq.                   Attorney for the Debtor/Defendant
Grafstein Law Offices
10 Melrose Drive
Farmington, CT 06032


**MEMORANDUM OF DECISION (EXCEPT AS TO AMOUNT OF RELEVANT DEBT)**


Lorraine Murphy Weil, Chief United States Bankruptcy Judge

The matter before the court is the above-referenced plaintiff's (the "Plaintiff") complaint (ECF No. 1, the "Complaint")[1] alleging that a certain judgment debt (the "Judgment Debt") owed by the above-referenced debtor/defendant (the "Debtor") was not discharged in this case pursuant to 11 U.S.C. § 523(a)(2)(A).[2]  This court has jurisdiction over this adversary proceeding as a core proceeding under 28 U.S.C. §§ 157 and 1334 and that certain Order dated September 21, 1984 of the District Court for this District (Daly, C.J.).[3]  This memorandum constitutes the findings of fact and conclusions of law mandated by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.    PROCEDURAL BACKGROUND

### A.    The Chapter 7 Case

The Debtor commenced this chapter 7 case by voluntary petition filed on or about August 14, 2008.  (*See* Case ECF No. 1.)  The Plaintiff filed a proof of claim in this case in the amount of $3,390,306.26.  (*See* Claims Register, Claim No. 9-1.)  General unsecured claims (in the aggregate amount of $3,503,215.82) were paid a dividend of approximately one (1%) percent in this case.  (*See* ECF No. 51 (chapter 7 Trustee's Final Account and Distribution Report).)  A chapter 7 discharge of the Debtor issued on November 14, 2008.  (*See* Case ECF No. 21.)

---

[1]      References herein to the docket of this adversary proceeding appear in the following form: "ECF No. __." References herein to the docket of this chapter 7 case appear in the following form: "Case ECF No. __."

[2]      The Complaint expressly sought relief under Section 523(a)(2)(A), but did not allude to Section 523(a)(4)(A).  ECF No. 68 is deemed to include a motion to amend the Complaint also to seek relief under Section 523(a)(4).  (*Cf.* ECF No. 68 at 9-12.)  Because such amendment makes no difference to the result reached herein, that request to amend is granted but only as to "embezzlement" within the purview of 11 U.S.C. § 523(a)(4).  Further references herein to the Complaint are references to the Complaint as so amended.

[3]      That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

B.    **Adversary Proceeding**

The Plaintiff commenced this adversary proceeding by filing the Complaint on or about October 10, 2008.  The Plaintiff seeks a determination that the Judgment Debt was not discharged in this chapter 7 proceeding pursuant to 11 U.S.C. §§ 532(a)(2)(A) and (a)(4).

The matter was before the Court for a five-day trial (the "Trial") on March 22, 2010, March 31, 2010, April 28, 2010, June 7, 2010 and July 12, 2010.[4]  At the Trial, Denise Imbert (the Debtor's former wife, "Denise") testified on behalf of the Plaintiff[5] and the Debtor, and the Debtor testified for himself.  Both sides introduced documentary evidence into the record.[6]

At the conclusion of the July 12, 2010 continued trial, the court took the matter under advisement (subject to post-trial briefing).  Post-trial briefing is complete.  (*See* ECF Nos. 63, 64, 68, 69, 70.)[7]  The matter now is ripe for the decision set forth below.

---

[4]    A transcript of the March 22, 2010 trial appears in the record as ECF No. 51 (the "3/22/2010 Transcript").  A transcript of the March 31, 2010 continued trial appears in the record as ECF No. 52 (the "3/31/2010 Transcript").  A transcript of the April 28, 2010 continued trial appears in the record as ECF No. 53.  A transcript of the June 7, 2010 continued trial appears in the record as ECF No. 54 (the "6/7/2010 Transcript").

[5]    Denise testified pursuant to a subpoena issued by the Plaintiff's counsel.  (*See* Plaintiff's Exh. 2.)

[6]    Hereinafter the exhibits will be referenced in the following form: "Plaintiff's Exh. __" or "Debtor's Exh. __" (as the case may be).

[7]    (*See also* ECF Nos. 71, 73, 74.)

II.    **FACTS**

A.    **Background**

The Debtor attended Nichols College in Dudley, Massachusetts and obtained a Bachelor of Science in business administration/business management. (*See* 3/22/2010 Transcript at 114:20-22 (testimony of the Debtor).) For a period of time, the Debtor worked for Aetna in the company's employee benefits division in Middletown, Connecticut. (*See id*. at 115:3-5 (testimony of the Debtor).) The Debtor later worked for Aetna as a sales representative for its employee benefits division in New York City. (*See id.* at 115:8-11 (testimony of the Debtor).) During the course of Denise's relevant conduct, the Debtor worked solely on his own three businesses (described below). (*See* 3/22/2010 Transcript at 123:6-17 (testimony of the Debtor).) Denise has a Bachelor of Science in accounting and was employed as an accountant at Corporate Air prior to her employment with the Plaintiff. (*See* 3/22/2010 Transcript at 42:22–43:7 (testimony of Denise).) At all relevant times subsequently (and until terminated), Denise was employed by the Plaintiff in an accounting capacity (as described more fully below).

The Debtor and Denise were married for thirteen years from on or about November 1, 1986 to October 26, 2000. (*See* Plaintiff's Exh. 1, Stipulation No. 7.) The Debtor moved out of the marital home in 1999. (*See* 3/22/2010 Transcript at 66:13-15 (testimony of Denise).) The Debtor and Denise were divorced on October 26, 2000. (*See* Plaintiff's Exh. 1, Stipulation No. 7.) The Debtor and Denise have two children (now of majority age) in common. (*See* 3/22/2010 Transcript at 28:11-14 (testimony of Denise).) The Debtor and Denise went to high school together and had known each other nine years prior to getting married. (*See id*. at 28:22-29:1 (testimony of Denise).) The Debtor and Denise shared household expenses during their marriage, had a joint bank account

- 4 -

and did not have any separate bank accounts.  (*See id*. at 30:14-24 (testimony of Denise).)  Denise

essentially had exclusive control over all of the household finances.  (*See id*. at 31:6-25 (testimony

of Denise).)  Even during the periods of time when the parties were separated, the Debtor did not

have a separate bank account and Denise handled all of the Debtor's banking.  (*See id*. at 146:6-13

(testimony of the Debtor).)

In addition to his interest in the Connecticut International Skating Center, LLC (the "LLC"),

the Debtor owned and operated two other businesses:  the Bullpen Sports Bar and Sequin

Enterprises.  (*See id*. at 123:12-17 (testimony of the Debtor).)  Denise served as the accountant for

both of those other businesses.  (*See id*. at 124:25–125:4 (testimony of the Debtor).)

### B.    The LLC and the Center

In approximately 1996, the Debtor and Denise made a decision to build and operate a public

skating rink (hereafter, the "Center").  (*See* 3/22/2010 Transcript at 32:23–33:4 (testimony of

Denise).)[8]  The Debtor had no experience building ice skating rinks.  (*See id*. at 116:20-22 (testimony

of the Debtor).)  The Debtor testified that the concept of building and operating the Center was a

"joint project" of the Debtor and Denise (*see* 3/31/2010 Transcript at 9:19–10:1 (testimony of the

Debtor))[9] and the husband and wife discussed a variety of aspects of the project (*see id.* at 8:21–10:1

---

[8]       The Center initially was conceived as a single rink facility.  However, the plan was
changed to a double rink facility for business reasons.  (*See* 3/22/2010 Transcript at 38:11–39:89
(testimony of Denise).)

[9]       That testimony was in answer to a question employing that characterization and posed
by the Plaintiff's counsel during cross-examination (*see id.* at 9:19 (question by Plaintiff's counsel)).
Accordingly, the court gives the "joint project" characterization little weight.  Similarly, the court
gives little weight to the Debtor's characterization of the Center as a "family-owned" business (*see*
3/31/2010 Transcript at 30:12 (testimony of the Debtor)) because (as explained below) members of
the limited liability company (*i.e.,* the LLC) that owned the facility were other members of his family
and did not include Denise.

(testimony of the Debtor)).  The Debtor and an acquaintance who was an architect, Michael Jarvis, put together a quasi-business plan to ascertain whether there was any interest in funding the project. (*See* 3/22/2010 Transcript at 118:7-15 (testimony of the Debtor).)  After learning there was interest in funding the project, the Debtor and Mr. Jarvis retained a consulting firm to evaluate the feasibility of the project.  (*See id*. at 118:12-21 (testimony of the Debtor).)

In order to finance the project, the Debtor and Denise applied for and obtained a small business loan (the "AT&T Loan") from AT&T Small Business Lending Corp. ("AT&T") in the amount of $2.5 million dollars.  (*See* 3/22/2010 Transcript at 35:24–36:11 (testimony of Denise).)[10] In addition, the Debtor and Denise contributed all of the household funds on hand to fund the project. (*See* 3/31/2010 Transcript at 8:12-20 (testimony of the Debtor).)

In connection with the project startup, the Debtor organized the LLC as a Connecticut limited liability company.  (*See* Plaintiff's Exh. 1, Stipulation Nos. 1, 3.)  The LLC was, from time to time, also known as: Connecticut International Skating Center, LLC; CSC, LLC; CISC, LLC and other variations.  (*See id.*, Stipulation No. 2.)  At all relevant times, the business or purpose of the LLC was to construct and operate the subject skating rink.  (*See id.*, Stipulation No. 6.)[11]  The Debtor was the managing member of the LLC and held a majority membership interest in the LLC.  (*See* 3/31/2010 Transcript at 6:12-14, at 8:7-9 (testimony of the Debtor).)  There were five other members of the LLC  (the Debtor's grandfather, his father, two uncles and the Debtor's cousin) who also "put

---

[10]    The Criminal Stipulation (as hereafter defined) recites that there was a $1.5 million loan from AT&T and a $1 million loan from the Small Business Administration.  (*See* Plaintiff's Exh. 3, Criminal Stipulation No. 1.)  The identity of the actual obligors for that loan or those loans (and if any were secondary obligors) is not of record.

[11]    Hereafter, (a) references to the business entity appear as "the LLC" and (b) references to the subject skating rink facility appear as the "Center."

up some initial capital" for the enterprise.  (*See id*. at 7:5–8:2; 3/22/2010 Transcript at 124:12-13

(testimony of the Debtor).)  Denise was not a member of the LLC and had no ownership interest in

the LLC or either of the Debtor's other two businesses.  (*See id.* at 85:11-19 (testimony of Denise),

at 145:13-23 (testimony of the Debtor).)  As the managing member of the LLC, the Debtor had

authority to hire and fire employees and contract with third parties on behalf of the LLC.  (*See*

3/31/2010 Transcript at 6:15-22 (testimony of the Debtor).)  Essentially, the Debtor had full control

of the operations of the LLC and had complete discretion as to how to run its business.  (*See id.* at

6:23–7:4 (testimony of the Debtor).)

Denise served as the LLC's accountant and bookkeeper.  (*See id*. at 25:6-11 (testimony of

the Debtor).)  Denise's responsibilities included handling all of the funds that were coming in and

going out of the LLC.  (*See id.* at 25:16-23 (testimony of the Debtor).)  Denise had check signing

authority and authority to endorse checks and deposit funds on behalf of the LLC.  (*See id*. at

25:24–26:9 (testimony of the Debtor).)  The Debtor, as the managing member of the LLC, was solely

responsible for giving that authority to Denise.  (*See id.* at 26:10-25 (testimony of the Debtor).)  The

Debtor delegated the LLC's financial matters to Denise because she was an accountant by trade, he

was not good with numbers and, between the LLC and his other two businesses, the Debtor was

working between 16 and 18 hours a day.  (*See* 3/22/2010 Transcript at 124:17–125:6, at 129:17–

130:7 (testimony of the Debtor).)

The Debtor generally did not see the LLC's bank statements.  (*See* 3/22/2010 Transcript at

133:15–134:7 (testimony of the Debtor).)  As noted above, Denise handled the couple's personal

accounts as well.  Accordingly, the Debtor generally did not see those account statements either.  The

Debtor and Denise did not receive a salary from the LLC but, rather, Denise would take money out

of "profits" to pay for household expenses. (*See* 3/31/2010 Transcript at 29:21–31:3 (testimony of the Debtor).) Construction of the Center began in approximately late 1996 to early 1997 and was completed at the beginning of 1999. (*See* Plaintiff's Exh. 1, Stipulation No. 17; 3/22/2010 Transcript at 40:22–41:1 (testimony of Denise).) The Center began operating in early 1999. (*See id.* at 41:2-4 (testimony of Denise).)

The Debtor acted as the general contractor for construction of the Center. (*See* 3/31/2010 Transcript at 11:19-22 (testimony of the Debtor).) The Debtor had little previous experience as a general contractor. (*See* 3/22/2010 Transcript at 116:20-117:6 (testimony of the Debtor).) In his capacity as general contractor, the Debtor dealt with between fifteen and twenty subcontractors. (*See* 3/31/2010 Transcript at 12:2-10 (testimony of the Debtor).) Even though the plan for the Center was changed from a single rink to a double rink facility, the Debtor and Denise still thought that construction could be accomplished within budget. (*See* 3/22/2010 Transcript at 39:17-20 (testimony of Denise).) However, construction went over budget for other reasons including that it became necessary to blast through rock to install utilities. (*See id.* at 39:23–40:5 (testimony of Denise).) It also did not help matters that construction problems materially delayed the opening of the Center and its production of revenue. (*See* 3/22/2010 Transcript at 135:23–136:10 (testimony of the Debtor).) Denise informed the Debtor in late 1998 (near the end of construction) that she could not pay bills incurred by the LLC because the project was running out of money (for reasons presumably including that credit availability on the AT&T Loan was exhausted or nearly exhausted). (*See id.* at 40:12-19, at 91:8-15 (testimony of Denise).)

The Debtor's initial plan to address the LLC's financial situation was to attempt to obtain additional investors; he was unable to obtain those additional investments. (*See id.* at 41:5-19

- 8 -

(testimony of Denise).)  The Debtor requested on more than one occasion that Denise ask her father

for a loan.  (*See id*. at 44:10-15, at 45:13-17 (testimony of Denise).)  Denise was reluctant to ask her

father for a loan due to the fact that her mother had recently passed away.  (*See id*. at 45:7-12

(testimony of Denise).)  However, Denise told the Debtor that her father had made funds available,

and the Debtor believed that until Denise told him otherwise in January/February, 2000.  (*See*

3/22/2010 Transcript at 48:1-11, at 106:14-20 (testimony of Denise).)[12]  Moreover, the Center was

an operational (if not financial) success.  (*See* 3/22/2010 Transcript at 121:8–122:7 (testimony of the

Debtor); 3/31/2010 Transcript at 10:15–11:18 (testimony of the Debtor).)  Accordingly, it is a

reasonable assumption that the Center produced at least some revenue and that the Debtor thought

that those revenues were funding operations (to some extent) as well.  As discussed below, in reality

all or substantially all of those funds came from the Plaintiff without its consent.

    **C.**    **The Embezzlements**[13]

        **1.**    **Background**

    At all relevant times, Denise was employed by the Plaintiff as an assistant treasurer and

accountant responsible for overseeing and managing the Plaintiff's financial accounts.  (*See*

Plaintiff's Exh. 1, Stipulation No. 8; Plaintiff's Exh. 3, Criminal Stipulation No. 3; 3/22/2010

Transcript at 46:1-4 (testimony of Denise).)  In that position, Denise had control over all of the

finances and day-to-day and monthly accounting for the Plaintiff.  (*See id*. at 46:8-10 (testimony of

Denise); *see also* Plaintiff's Exh. 1, Stipulation No. 8.)  Denise also had authority over the Plaintiff's

---

[12]    The court's finding as to that approximate date is discussed more fully in part III.A., below.

[13]    The court uses the term "embezzle" and "embezzlement" herein in their colloquial sense and not necessarily in their precise legal sense.

bank accounts and financial records and had authority to sign and issue checks. (*See* Plaintiff's Exh.

1, Stipulation No. 9; 3/22/2010 Transcript at 46:11-19, at 60:6-10 (testimony of Denise).)   The

Debtor was aware of Denise's responsibilities with the Plaintiff. (*See* 3/22/2010 Transcript at 46:20-

23 (testimony of Denise).)

### 2.   The Embezzlements (Generally)

Instead of asking her father for a loan to address the budget issues encountered in

constructing the Center, Denise began wrongfully issuing checks on the Plaintiff's accounts. (*See*

3/22/2010 Transcript at 45:21-23 (testimony of Denise); *see* also Plaintiff's Exh. 1, Stipulation

Nos. 18 and 19.) In order to do so, Denise forged the signature of Anne Csuka, the Plaintiff's Vice

President.   (*See* 3/22/2010 Transcript at 60:11-25 (testimony of Denise); Plaintiff's Exh. 1,

Stipulation No. 20.) Denise had no authority and knew she had no authority to issue the checks to

herself or the LLC. (*See* Plaintiff's Exh. 1, Stipulation No. 21.) From the period of November 1998

to December 2000 or January 2001,[14] Denise issued approximately thirty-five (35) checks (the

"Checks") on the Plaintiff's account totaling over three million dollars. (*See* 3/22/2010 Transcript

at 50:8–51:21 (testimony of Denise); Plaintiff's Exh. 1, Stipulation No. 19; Plaintiff's Exh. 1B;

Plaintiff's Exh. 1C.)   The Checks issued by Denise were made payable either to the LLC or to

herself.   (*See* Plaintiff's Exh. 1B; Plaintiff's Exh. 1C.) Denise deposited the Checks issued to the

LLC into the LLC's account. (*See* 3/22/2010 Transcript at 53:12-18 (testimony of Denise).) Denise

deposited the Checks issued to her individually into her joint account with the Debtor. (*See id.* at

---

[14]      Plaintiff's Exh. 1, Stipulation No. 19 states that the relevant embezzlement period was
from November 1998 to January 2001. However, Plaintiff's Exh. 1B lists the end date as December
1, 2000 and the copy of the last forged check in Plaintiff's Exh. 1C is dated December 1, 2000.
Therefore, the evidence appears to establish the relevant end date to be December 2000. The parties'
briefs (*see* ECF Nos. 63, 64) use December 2000 as the end date as well.

53:19–54:4 (testimony of Denise).)   The embezzled funds that were deposited into the LLC's

account were used to pay the LLC's bills.  (*See id.* at 108:10-13 (testimony of Denise).)   The

embezzled funds that were deposited into the marital account were used to pay the Debtor's and

Denise's mortgage and personal bills because all their money had been used for the Center.  (*See id.*

at 58:10-25 (testimony of Denise).)

Denise's plan to avoid getting caught by the Plaintiff was that she would transfer money

between the Plaintiff's escrow accounts.  (*See id.* at 49:12-24 (testimony of Denise).)   In carrying

out the scheme, Denise made entries on the Plaintiff's financial records to cover up the money that

was being taken.  (*See id.* at 59:14-20 (testimony of Denise).)   When Denise was on vacation, the

Plaintiff found a problem with a wire transfer, found some accounts that were "messed up," and

discovered that Denise had been embezzling money.  (*See id.* at 59:5-13 (testimony of Denise).)

Denise and the Debtor both testified that initially the Debtor had no knowledge that Denise

was embezzling from the Plaintiff.  (*See* 3/22/2010 Transcript at 47:13-18 (testimony of Denise), at

138:3-5 (testimony of the Debtor).)   The court credits that testimony.   Denise testified that she

informed the Debtor in January/February, 2000 that she had been embezzling money from the

Plaintiff.  (*See id.* at 101:20–102:8, at 106:14-20 (testimony of Denise).)   At the Trial, the Debtor

initially could not recall the date when Denise first informed him that she had been embezzling

money, nor could he even recall the year.  (*See id.* at 134:12-18 (testimony of the Debtor).)   He later

more or less adopted Denise's testimony on that point.  (*See* 3/31/2010 Transcript at 85:9-25

(testimony of the Debtor); 6/7/2010 Transcript at 15:5-6 ("I did not know about [the embezzlement]

prior to 2000 . . . .") (testimony of the Debtor).)   However, the Debtor signed a Stipulation of

Offense Conduct (the "Criminal Stipulation") as part of a guilty plea agreement in the matter of

- 11 -

*United States of America v. Douglas R. Budnick*, United States District Court, District of Connecticut, Case No.: 3:03CR42(CFD) (the "Criminal Proceedings"), stipulating that he became aware of the fact that Denise was embezzling money from the Plaintiff in or around February, 1999. (*See* 3/31/2010 Transcript at 65-69 (testimony of the Debtor); Plaintiff's Exh. 3, Criminal Stipulation No. 5.)[15]  In so doing, the Debtor certified that he read the Criminal Stipulation, that he had ample time to discuss that agreement with counsel and that he fully understood and accepted the terms of the same.  (*See* 3/31/2010 Transcript at 66:7–68:16 (testimony of the Debtor); Plaintiff's Exh. 3 at 5.)

After the Debtor learned that Denise had been embezzling money from the Plaintiff, Denise continued to issue Checks on the Plaintiff's accounts (the "Subsequent Embezzlements").[16]  (*See* 3/22/2010 Transcript at 54:5–55:12 (testimony of Denise); 3/31/2010 Transcript at 57:13-22 (testimony of the Debtor).)  Denise claims that she and the Debtor had discussions about her issuing those additional Checks and that the Debtor directly or impliedly told her to issue those Checks to keep the Center running pending its potential sale.  (*See* 3/22/2010 Transcript at 55-57 (testimony of Denise).)[17]  The Debtor denies the foregoing and claims that he did not expect that Denise would continue to embezzle.  (*See* 3/31/2010 Transcript at 89:1-12, at 58:3–59:21 (testimony of the Debtor).)  The court credits Denise's testimony over the Debtor's testimony on those points.

---

[15]    *See* discussion of the Debtor's and Denise's criminal convictions, below.

[16]    Denise's embezzlement from the Plaintiff prior to that time are referred to herein-below as the "Earlier Embezzlements."

[17]    The concept was that the Center promptly would be sold, and the net proceeds used to retire the debt to the Plaintiff in whole or substantial part.  (*See* 3/22/2010 Transcript at 137:4–138:2 (testimony of the Debtor).) The Center ultimately was sold, but not soon enough to avert discovery or for enough money to resolve the couple's problems.

### 3.    Criminal Convictions

After the Plaintiff discovered Denise's embezzlements, it gave Denise about two years to work the matter out before the Plaintiff went to the authorities.  (*See* 3/22/2010 Transcript at 80:9-15 (testimony of Denise); 3/31/2010 Transcript at 32:1-25 (testimony of the Debtor).)[18]  Eventually, Denise was charged with the federal crimes of mail fraud and tax fraud.  (*See* 3/22/2010 Transcript at 26:4-11 (testimony of Denise).)  Denise pled guilty to the charges and served eighteen (18) months in federal prison.  (*See id.* at 26:12-18 (testimony of Denise).)  The Debtor  was charged with the federal crime of subscribing to a false tax return with respect to the couple's tax return for 1999. (*See id.* at 150:24–151:1 (testimony of the Debtor).)  That 1999 tax return was prepared for the Debtor and Denise on or about April 13, 2000 and was signed by them under penalty of perjury.  (*See* Plaintiff's Exh. 3, Criminal Stipulation No. 6.)  The Debtor pled guilty to that charge in the Criminal Proceedings and served six (6) months in federal prison and four (4) months under house arrest.  (*See* 3/22/2010 Transcript at 151:2-15 (testimony of the Debtor).)

### 4.    Repayments to the Plaintiff

Over $800,000 was paid back to the Plaintiff from December 29, 1999 to February 23, 2001 on account of Denise's embezzlement.  (*See id.* at 51:22–53:9 (testimony of Denise); Plaintiff's Exh. 1B.)[19]  Some or all of this $800,000 was obtained from Denise's father, Denise's Section 401(k)

---

[18]    The Plaintiff wanted to avoid publicity.  (*See* 3/31/2010 Transcript at 36:1-6 (testimony of the Debtor).)

[19]    The court notes that two repayments took place before the Confession Date (as defined below): $63,000 on December 29, 1999 and $100,000 on December 30, 1999.  The record does not reflect the source(s) of those payments and whether the Debtor was aware of them.  One possible scenario is that those payments came from Denise's father and/or Denise's Section 401(k) account, and that the Debtor was not aware of them prior to the Confession Date.

account and certain of the Debtor's family members.  (*See* 3/22/2010 Transcript at 53:3-9, at 61:1-13

(testimony of Denise); 3/31/2010 Transcript at 90:6-21 (testimony of the Debtor).)[20]

### 5.    The Judgment

On December 11, 2003, the Plaintiff obtained a judgment by default (the "Judgment")[21]

against the Debtor, Denise and the LLC in the amount of $2,268,604.16 in the matter of *Connecticut*

*Attorneys Title Ins. Co. vs. Connecticut Int'l Skating Center, LLC, et al.*, Superior Court of

Connecticut, Judicial District of Hartford, Docket No.: CV-03-0826389-S (the "State Court

Proceedings").  (*See* Plaintiff's Exh. 1A; Plaintiff's Exh. 1, Stipulation No. 24.)  The Judgment

underlies the Judgment Debt.  The Judgment was based on the same facts as alleged in the

Complaint in this adversary proceeding.  (*See* Plaintiff's Exh. 1, Stipulation Nos. 24, 25; Debtor's

Exh. C.)[22]

---

[20]    The court also notes the following statement by the Debtor's counsel:  "I . . . just heard today from counsel that . . . [Denise] may have repaid some money as a condition of probation. And we're not expecting the Court to make a finding of the exact amount of money that . . . is owed to . . . [the Plaintiff]."  (3/22/2010 Transcript at 20:25–21:5 (remarks of the Debtor's counsel).)

[21]    The Plaintiff does not assert that the Judgment has collateral estoppel implications in this proceeding (other than to establish that the Debtor owes the Plaintiff the Judgment Debt). (*See* 3/22/2010 Transcript at 13:9–15:22 (remarks of Plaintiff's counsel).)

[22]    The state court complaint (the "State Court Complaint") is of record in this proceeding.  (*See* Debtor's Exh. C.)  The State Court Complaint sounds in four counts:  Count One appears to sound in fraud; Count Two appears to sound in "reckless indifference or intentional and wanton violation of the plaintiffs rights" and/or conversion; Count Three appears to sound in unjust enrichment; Count Four seeks treble damages pursuant to Conn. Gen. Stat. § 52-564.  The Superior Court awarded actual damages only and did not award punitive or treble damages nor is there an explanation of the theory on which the Judgment was awarded.  (*Compare* Plaintiff's Exh. 1, Stipulation No. 24 *with* Plaintiff's Exh. 1A.)  Accordingly, the Judgment could have been rendered against the Debtor strictly on an unjust enrichment theory.  Unjust enrichment does not necessarily require fraud or other tortious conduct.  *See Gagne v. Vaccaro,* 255 Conn. 390, 409-10 (2001) (citing three elements of unjust enrichment).  *See also Connecticut Nat'l Bank v. Chapman*, 153 Conn. 393, 399 (1966) ("It is not necessary, in order to create an obligation to make restitution or to compensate,

III.    **ANALYSIS**

    A.    **Timing of Denise's Confession to the Debtor**

        1.    **Testimony in this Adversary Proceeding**

As noted above, Denise testified that she first told the Debtor about the embezzlements in January/February, 2000. Also as noted above, the Debtor at first was unable to identify the date upon which Denise confessed the embezzlement to him, but ultimately adopted Denise's January/February, 2000 date. During the Trial, the court found Denise to have a much better recall of details than the Debtor. Moreover, the court cannot identify a motive for Denise to tell a lie in the Debtor's favor. Further, the Debtor had prescription drug and alcohol problems during the relevant period and his memory of that time period therefore is suspect. (*See* 3/31/2010 Transcript at 57:1-3 (testimony of the Debtor); Plaintiff's Exh. 5 at 30:1-12 (statement of the Debtor).) That may explain his problems recalling relevant events. Accordingly, the court credits Denise's testimony as to January/February, 2000 (the "Confession Date") as the relevant date.

        2.    **Effect of the Criminal Stipulation**

The Debtor's identification of February, 1999 in the Criminal Stipulation as the Confession Date was a judicial admission in the Criminal Proceedings. However, a "judicial admission only binds the party that makes it in the action in which it is made." *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004). Unless the elements of estoppel are present, in the later action the judicial admission in the earlier action is treated as an evidentiary admission. *See* 32 C.J.S. *Evidence* § 631 (2011). "The evidence is not conclusive but may be rebutted, and it must be weighed along with all other evidence by the trier of fact." *Eagle*

that the party unjustly enriched should have been guilty of any tortious or fraudulent act.").

*Indus. Truck Mfg., Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),* 125 B.R. 415, 417 (Bankr. D. Del. 1991).

The burden is on the Plaintiff to plead and prove estoppel. *See Heflin v. Santander Consumer USA, Inc. (In re Heflin)*, 464 B.R. 545, 554 (Bankr. D. Conn. 2011) ("The burden of proving every element of an estoppel is upon the party seeking to set up the estoppel."). The Plaintiff did not specifically invoke the doctrine of estoppel here. Rather, the Plaintiff notes that, in the Criminal Proceedings, the court placed some emphasis on the putative February, 1999 Confession Date stated in the Criminal Stipulation in arriving upon the Debtor's sentence. (*See* Plaintiff's Exh. 3, Criminal Stipulation No. 5.) Presumably, a later January/February, 2000 Confession Date might have worked in the Debtor's favor (and, in any event, would not have hurt him). Moreover, the January/February, 2000 Confession Date first was articulated here by the Plaintiff's own witness, Denise. Accordingly, this court is not persuaded that the Debtor is playing "fast and loose" with the courts by using the January/February, 2000 Confession Date here. *See Wight v. BankAmerica Corp.,* 219 F.3d 79, 89 (2d Cir. 2000) ("Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits."). *See also Galin v. I.R.S.,* 563 F.Supp. 2d 332, 339 (D. Conn. 2008) ("Judicial estoppel . . . is an equitable doctrine invoked by a court at its discretion.").

As explained above and even taking into account the earlier date stated in the Criminal Stipulation, the court is persuaded that January/February, 2000 is the more reliable estimate of the Confession Date.

### B.    Theories of "Vicarious Liability"

"Vicarious liability is based on a relationship between the parties, irrespective of participation, either by act or omission, of the one vicariously liable, under which it has been determined as a matter of policy that one person should be liable for the act of . . . [another].  Its true basis is largely one of public or social policy under which it has been determined that, irrespective of fault, a party should be held to respond for the acts of another." *Alvarez v. New Haven Register, Inc.,* 249 Conn. 709, 720 (1999) (internal quotation marks omitted).  It is uncontested that the spousal relationship does not automatically impose vicarious liability on one spouse for the wrongful acts of the other: something more is needed.  *See Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 287 B.R. 515, 518 (B.A.P. 9th Cir. 2002) ("[A] marital union alone, without a finding of a partnership or other agency relationship between spouses, cannot serve as a basis for imputing fraud from one spouse to the other." (internal quotations marks omitted)).   Here the Plaintiff seeks to impose vicarious nondischargeable liability on the Debtor for the wrongful acts of Denise on two theories: partnership and agency.   Each theory (and the theory of civil conspiracy raised by the Debtor)[23] is discussed below.

### 1.    Joint Venture/Partnership

The Plaintiff appears to suggest that the Debtor and Denise were joint venturers with respect to the Center.  Joint ventures generally are governed by common law partnership principles.  *See Doe v. Yale University,* 252 Conn. 641, 673-74 (2000).  However, "joint ventures relate to a single transaction, whereas partnerships exist for a general business." *Davies v. General Tours, Inc.,* 63 Conn. App. 17, 29, *cert. granted in part*, 256 Conn. 926 (2001) (internal quotation marks omitted).

---

[23]    (*see* ECF No. 63 at 20-24)

Whether or not a relationship between parties is a joint venture is a question of their intent.  *See*

*Davies, supra.*  The Debtor and Denise contemplated the construction of the Center and its later

operation as a business.  That is not a "single transaction."  Accordingly, if any relevant business

combination between the Debtor and Denise existed at all, it would have had to be a partnership.

"'Partnership' means an association of two or more persons to carry on as co-owners a

business for profit . . . . " Conn. Gen. Stat. Ann. § 34-301(12) (West 2012).  Here, the relevant

business was conducted in the form of the LLC.  It has not been suggested that the LLC was a sham.

Denise was not a member of the LLC nor did she have an ownership interest in either of the Debtor's

other two businesses. The record does not support a finding that either Denise or the Debtor held

record title to the Center at any time.   Denise herself testified that she had no ownership interest in

either the Center or the LLC.  (*See* 3/22/2010 at 85:11-20 (testimony of Denise).)  Weighing all the

facts and circumstances of record with or against (as the case may be) the foregoing, the court is not

persuaded that the Debtor and Denise carried on business with respect to the Center as "co-owners."

Accordingly, the court is not persuaded that the alleged partnership existed.

### 2.   **Agency**

It is uncontested that in carrying out her accounting function with respect to the Center,

Denise generally acted as the Debtor's agent (subject to the scope of the agency).

> [I]t is a general rule of agency law that the principal in an agency relationship is
> bound by, and liable for the acts in which his agent engages with authority from the
> principal, and within the scope of the agent's employment . . . .  An agent's authority
> may be actual or apparent.
>
> Actual authority may be express or implied.  Implied authority is actual authority
> circumstantially proved. It is the authority which the principal intended his agent to
> possess.  Implied authority is a fact to be proven by deductions or inferences from the
> manifestations of consent of the principal and from the acts of the principal and [the]
> agent.

- 18 -

*Cammarota v. Cammarota,* No. CV065002935, 2011 WL 3276756, at *2 (Conn. Super. July 1, 2011) (citations omitted; internal quotation marks omitted).

The Restatement of Agency supplies the following guidelines for determining the scope of the agent's actual authority:

> (1) An agent has actual authority to take action designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act.
> (2) An agent's interpretation of the principal's manifestations is reasonable if it reflects any meaning known by the agent to be ascribed by the principal and, in the absence of any meaning known to the agent, as a reasonable person in the agent's position would interpret the manifestations in light of the context, including circumstances of which the agent has notice and the agent's fiduciary duty to the principal.
> (3) An agent's understanding of the principal's objectives is reasonable if it accords with the principal's manifestations and the inferences that a reasonable person in the agent's position would draw from the circumstances creating the agency.

Restatement of the Law (Agency) 3d § 2.02 (2006).[24]

### 3.    Civil Conspiracy

"The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Marshak v. Marshak,* 226 Conn. 652, 665 . . . (1993). [n. 37] . . . [T]here is no independent claim of civil conspiracy. Rather, "[t]he action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." (Emphasis added; internal quotation marks omitted.) *Marshak v. Marshak,* [ *supra,* at 669]. Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort.

---

[24]    The concept of "apparent authority" relates to how the injured third party reasonably perceived the scope of the agent's authority based upon whether the principal held the agent out as having the requisite authority.  *See Nowak v. Capitol Motors, Inc.,* 158 Conn. 65, 69 (1969).  The concept of "apparent authority" is not relevant here.

*Harp v. King*, 266 Conn. 747, 779 (2003).

Further, a civil conspiracy is not actionable in itself: for a plaintiff to recover damages, he must show that the overt act in question is tortious and has damaged him. That is, a plaintiff must prove an independent underlying cause of action before the civil conspiracy claim becomes material. *See, e.g., Litchfield Asset Management Corp. v. Howell*, 70 Conn. App. 133, 140 (2002); *see also Dumais v. Hartford Roman Catholic Archdiocese*, 2002 Ct. Sup. 9774 (Sferrazza, J.) (2002) (32 Conn. L. Rptr. 693); *Sparano v. Daughters of Wisdom, Inc.*, 2004 Ct. Sup. 10653 (Adams, J.) (2004) (37 Conn. L. Rptr. 422).

. . .

[C]ivil conspiracy is not itself a cause of action. Indeed, it has been aptly noted that the benefit of the notion of civil conspiracy to a plaintiff is not that it creates liability where otherwise none might exist, but rather it expands the universe of those potentially liable for the harm. It is, in effect, a variant of vicarious liability.

*Noll v. Hartford Roman Catholic Diocesan Corp.,* No. X04CV024000582S, 2005 WL 2130212, at *1-*2 (Conn. Super. July 29, 2005) (fourth alteration added; footnote omitted).

### C.    Section 523(a)(2)(A)

#### 1.    Applicable Law

Bankruptcy Code § 523(a)(2)(A) allows the court to make a determination of nondischargeability for "any debt – for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C.A. § 523(a)(2)(A) (West 2012). "Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and a false representation." *Deady v. Hanson (In re Hanson),* 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010), *aff'd,* 2012 WL 957491 (N.D. Ill. Mar. 19, 2012). Exceptions to discharge must be strictly construed in favor of the debtor in order to effectuate the fresh start policy of bankruptcy. *See Rosenblit v. Kron (In re Kron)*, 240 B.R. 164, 165 (Bankr. D. Conn. 1999) (Krechevsky, J.). The party seeking to establish an exception to the

- 20 -

discharge of a debt bears the burden of proof by a preponderance of the evidence. *See Grogan v.*

*Garner,* 498 U.S. 279 (1991); *Ramos v. Rivera (In re Rivera),* 217 B.R. 379, 384 (Bankr. D. Conn.

1998) (Dabrowski, J.).[25]

Section 523(a)(2)(A) excepts from discharge a debt for money or an extension, renewal, or

refinancing of credit "*to the extent* obtained by false pretenses, a false representation, or actual

fraud." 11 U.S.C. § 523(a)(2)(A) (emphasis added). To sustain a claim of nondischargeability under

Section 523(a)(2)(A), the plaintiff therefore must make an initial showing that the alleged "fraud . . .

existed at the time of, and has been the methodology by which, the money, property or services were

obtained." *Wilcoxon Construction, Inc. v. Woodall (In re Woodall)*, 177 B.R. 517, 523 (Bankr. D.

Md. 1995).

> The Supreme Court has held that § 523(a)(2)(A)'s reference to "actual fraud" was
> intended to "incorporate the general common law of torts, the dominant consensus
> of common-law jurisdictions, rather than the law of any particular State." *Field v.*
> *Mans*, 516 U.S. 59, 71, n. 9, 116 S. Ct. 437, 133 L.Ed.2d 351 (1995). The Second
> Circuit has construed the meaning of actual fraud to include "a false representation,
> scienter, reliance, and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006)
> (citing Restatement (Second) of Torts § 525). Thus, courts in this circuit have found
> that "actual fraud" by definition consists of "any deceit, artifice, trick or design
> involving direct and active operation of the mind, used to circumvent and cheat
> another—something said, done or omitted with the design or perpetrating what is
> known to be a cheat or deception." *See e.g., In re Lyon*, 348 B.R. 9, 22 (Bankr. D.
> Conn. 2006).

*McCarron v. Andrews (In re Andrews),* 385 B.R. 496, 508 (Bankr. D. Conn. 2008) (Shiff, J.).

> [B]ecause common law fraud does not always take the form of a misrepresentation,
> a creditor need not allege misrepresentation and reliance thereon to state a cause of
> action for actual fraud under § 523(a)(2)(A). Rather, the creditor must establish the
> following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and
> (3) the fraud created the debt that is the subject of the discharge dispute. The fraud
> exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones.

---

[25]     That burden of proof also applies to Section 523(a)(4).

> The existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor.

*Hanson,* 432 B.R. at 772 (citations omitted).

> False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression.  *Mem'l Hosp. v. Sarama (In re Sarama),* 192 B.R. 922, 927 (Bankr.N.D.Ill.1996).  [F]alse pretenses [is defined] as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor . . . .

> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Hanson,* 432 B.R. at 771 (first and second alteration added).

The court concludes that Denise committed actual fraud against the Plaintiff with respect to her embezzlement.  The issue is whether Denise's fraud can be imputed to the Debtor for Section 523(a)(2) nondischargeability purposes.

"[A] debt may be excepted from discharge when the debtor personally commits actual, positive fraud, and also when such actual fraud is imputed under . . . [vicarious liability] principles." *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148, 1151 (11th Cir. 2001), *cert. denied*, 535 U.S. 1112 (2002).  However, there is some doubt as to whether fraud can be imputed to a debtor who neither knew nor had reason to know of the fraud.  *See National Union Fire Ins. Co. of Pittsburgh, P.A. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 302 (2d Cir. 1996).  *Cf. In re Rivera*, 271 B.R. 379

(limiting imputation of the basis for nondischargeability without debtor culpability to the partnership context).

### 2.    Application of Law to Fact

#### a.    The Earlier Embezzlements

As noted above, the Debtor could be vicariously liable for Denise's misdeeds with respect the Earlier Embezzlements only on an agency theory or a theory of civil conspiracy (the theories of partnership and joint venture already having been rejected).  With respect to an agency theory, the issue is whether the Earlier Embezzlements were within either the express or implied authority given to Denise by the Debtor.  Denise kept the Earlier Embezzlements a secret from the Debtor.  Furthermore, the Debtor told Denise to obtain a loan from her father; embezzling from the Plaintiff was Denise's own idea.  The court finds that Denise could not reasonably have understood that the Earlier Embezzlement were within the scope of her actual authority.  Accordingly, the court is not persuaded that the Earlier Embezzlements were within the scope of Denise's agency for the Debtor.  Therefore, the Debtor cannot be vicariously liable for those misdeeds by Denise on an agency theory.

With respect to civil conspiracy, the court is not persuaded that there was either an express or implied agreement between the Debtor and Denise for Denise to commit the Earlier Embezzlements.  Accordingly, the Debtor cannot be vicariously liable for Denise's misdeeds with respect to the Earlier Embezzlements on a civil conspiracy theory.

#### b.    Subsequent Embezzlements

The result is different with respect to the Subsequent Embezzlements.  The court finds and concludes that, with respect to the Subsequent Embezzlements, Denise committed actual fraud against the Plaintiff.  Denise's Subsequent Embezzlements of the Plaintiff's funds were fraudulent

and intentional and damaged the Plaintiff.  On an agency theory and taking into account the facts set forth above, the court finds and/or concludes that the Subsequent Embezzlements were with the Debtor's knowledge and were within either Denise's actual or implied authority as the Debtor's agent.  Accordingly, Denise's fraud with respect to the Subsequent Embezzlements is imputed to the Debtor on an agency theory and the Judgment Debt is nondischargeable to that extent in this case on an "actual fraud" theory pursuant to Section 523(a)(2)(A).

A civil conspiracy analysis yields the same result.  Taking into account the facts set forth in part II.C.2, above, the court finds and/or concludes that the Debtor and Denise entered into either an express or implied agreement for Denise to effectuate the above-described fraud with respect to the Subsequent Embezzlements.  Denise carried the conspiracy out and the Plaintiff was injured thereby. Accordingly, Denise's fraud with respect to the Subsequent Embezzlements is imputed to the Debtor on a civil conspiracy theory and the Judgment Debt also is nondischargeable to that extent in this case on an "actual fraud" theory pursuant to Section 523(a)(2)(A).[26]

---

[26]     Under either theory, the Debtor's liability with respect to the Subsequent Embezzlements is not purely vicarious but, rather, involves a substantial degree of Debtor wrongdoing.  Accordingly, the court need not reach the issue of whether the agent's fraud can be imputed to an innocent debtor noted by the Second Circuit in *Bonnanzio, supra*.  *See also Rivera*, *supra.*

As discussed above, the court has concluded that the Debtor was innocent with respect to the Earlier Embezzlements.  Based on the foregoing and the court's determination that the Debtor was vicariously liable for Denise's fraud with respect to the Subsequent Embezzlements, consideration of whether the Debtor also would be directly liable for his own fraud (if any) with respect to *any* of the embezzlements adds nothing to the analysis.

- 24 -

**D.    11 U.S.C. § 523(a)(4) ("embezzlement")**

**1.    Applicable Law**

"'Embezzlement', for the purposes of Section 523(a)(4), is defined by federal common law as the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *In re Rivera*, 217 B.R. at 385 (citation and internal quotation marks omitted).  "To prove embezzlement, the creditor must show by a preponderance of the evidence (1) that the debtor appropriated the subject funds for his own benefit[27] and (2) that he did so with fraudulent intent or deceit."  *Pierce v. Pyritz*, 200 B.R. 203, 205 (N.D. Ill. 1996). "Fraudulent intent may be determined from the facts and circumstances surrounding the act." *Estate of Stanford Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 779 (Bankr. E.D. Pa. 2004), *aff'd*, 2005 WL 2396489 (E.D. Pa. Sept. 28, 2005) (internal quotation marks omitted).

**2.    Vicarious Liability/Nondischargeability**

**a.    The Earlier Embezzlements**

For the reasons set forth in part III.C.2.a, above, the court concludes that the Debtor was innocent with respect to the Earlier Embezzlements.  Accordingly, there is no basis upon which the relevant portion of the Judgment Debt can be held to be nondischargeable.

**b.    The Subsequent Embezzlements**

As discussed in part III.C.2.b. above, the Debtor was vicariously liable for Denise's misdeeds with respect to the Subsequent Embezzlements.  However, because nondischargeability under

---

27      The court expresses no opinion as to whether, to "make out a case of embezzlement, the accused need not appropriate the property to his or her own use, but is guilty if he or she fraudulently appropriates it to the use of another." 29A C.J.S. *Embezzlement* § 17 (2011) (footnotes omitted).

Section 523(a)(4) adds nothing to the relief granted above under Section 523(a)(2)(A) with respect

to the Subsequent Embezzlements, the court need not consider the Plaintiff's Section 523(a)(4) claim

with respect to the Subsequent Embezzlements.

## IV.    CONCLUSION

For the reasons set forth below, the court concludes that (a) the Judgment Debt was not

discharged in this chapter 7 case pursuant to Section 523(a)(2)(A) to the extent that such debt relates

to the Subsequent Embezzlements, and (b) the remainder of the Judgment Debt was discharged in

this chapter 7 case.  However, the record of this proceeding is insufficient for this court to liquidate

the amount of the subject nondischargeable debt.  Accordingly, a separate order will issue scheduling

a status conference to discuss appropriate "next steps" (if any) to bring these proceedings to an

appropriate adjudication.

Dated: April 9, 2012                              BY THE COURT

Lorraine Murphy Weil
Chief United States Bankruptcy Judge